STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

11-609


CHRISTINA HOYT HUTTO, ET AL.

VERSUS

MCNEIL-PPC, INC., ET AL.



**********

APPEAL FROM THE
TWENTY-SEVENTH JUDICIAL DISTRICT COURT
PARISH OF ST. LANDRY, NO. 04-C-0096-D
HONORABLE DONALD WAYNE HEBERT, DISTRICT JUDGE

**********

ELIZABETH A. PICKETT
JUDGE

**********

Court composed of Marc T. Amy, Elizabeth A. Pickett, and J. David Painter, Judges.


AFFIRMED.


Kathleen Ann Manning
McGlinchey Stafford, PLLC
12th Floor, 601 Poydras Street
New Orleans, LA 70130
(504) 586-1200
COUNSEL FOR DEFENDANT/APPELLANT:
    McNeil-PPC, Inc.

**Charles S. Weems, III**
**Gold, Weems, Bruser, Sues & Rundell**
**P. O. Box 6118**
**Alexandria, LA 71307-6118**
**(318) 445-6471**
**COUNSEL FOR DEFENDANT/APPELLANT:**
**McNeil-PPC, Inc.**

**Robert W. Sparks**
**Debra D. O'Gorman**
**Patrick G. Broderick**
**Michael E. Planell**
**Dechert, LLP**
**1095 Avenue of the Americas**
**New York, NY 10036**
**(212) 649-8756**
**COUNSEL FOR DEFENDANT- APPELLANT:**
**McNeil-PPC, Inc.**

**J. Clemille Simon**
**Barry L. Domingue**
**Simon Law Offices**
**P. O. Box 52242**
**Lafayette, LA 70505-2242**
**(337) 232-2000**
**COUNSEL FOR PLAINTIFFS/APPELLEES:**
**Christina Hoyt Hutto**
**Eric Hutto**

**Donald W. Washington**
**Nadia de la Houssaye**
**Jones, Walker, Waechter, Poitenvent, Carrère & Denègre, LLP**
**P. O. Box 3408**
**Lafayette, LA 70502**
**(337) 262-9000**
**COUNSEL FOR DEFENDANT/APPELLEE:**
**The Louisiana Patients Compensation Fund**

**PICKETT, Judge.**

The defendant drug manufacturer in this products liability/medical malpractice case appealed a judgment that held it and the defendant health care provider liable to the plaintiffs for the death of their infant daughter. The defendant health care provider and the plaintiffs answered the appeal. For the following reasons, we affirm the judgment.

## FACTS

Brianna Hutto was born to Eric and Christina Hutto on July 31, 2002. Eric and Christina were seventeen years of age and lived with Christina's mother, Theresa Oliver, in St. Landry Parish. The morning of January 3, 2003, Brianna was fussy and running a slight fever; she was vomiting, and her bowel movements were not normal. Christina gave Brianna 0.8 ml of Infants' Tylenol® Concentrated Drops (Infants' Tylenol®). When Brianna's fever did not subside and her condition did not improve, Christina brought her to the emergency department of Opelousas General Hospital (OGH). While waiting for Brianna to be seen by a physician, Christina showed OGH emergency department personnel the bottle of Infants' Tylenol® she had administered to Brianna that morning. Brianna's 11:00 a.m. dose of 0.8 ml Infant's Tylenol® was noted on the Intake sheet generated with Brianna's treatment that evening.

After Brianna was examined by the emergency physician, an OGH nurse gave Christina written after-care instructions which instructed that Brianna be given three-quarters of a teaspoon "Tylenol®." Theresa questioned whether the dose was appropriate for such a young infant, and the nurse left her and Christina. The nurse returned and changed the instruction from three-quarters of a teaspoon

to one teaspoon, explaining the higher dose would be more effective for Brianna's weight.

Unbeknownst to Christina and Theresa, the nurse's instruction referred to Children's Tylenol® not Infant's Tylenol® because OGH used Children's Tylenol® exclusively. Christina and Theresa assumed the instruction referred to the Infants' Tylenol® Christina used before bringing Brianna to the hospital because she had shown the bottle to OGH personnel. At the time, OGH nurses, not doctors, calculated the appropriate doses of acetaminophen. OHG's representative testified that the nurse did not consult the doctor who treated Brianna when he gave his "Tylenol®" dosing instruction. Infant's Tylenol® is approximately four times more concentrated than Children's Tylenol®.

OGH had a written policy on addressing questions caregivers, like Christina and Theresa, had about Tylenol® dosing. The policy required OGH personnel to give the caregivers a Tylenol® dosing sheet. The dosing sheet was prepared and distributed by McNeil; it identified four different Tylenol® products that are for infants or children and specified the different dosing instructions for each product. OGH's policy also required its personnel to circle the correct dose on the dosing sheet to insure caregivers knew which product and how much product to administer to the infant or child patient. OGH admitted that it violated its own policy by not providing Christina and Theresa with a dosing sheet.

The Huttos testified that after leaving OGH, they administered one teaspoon of Infants' Tylenol® to Brianna four times: 12:00 midnight to 1:00 a.m. January 4; January 4, between 7:30 and 8:00 a.m. and again at approximately 8:00 p.m.; and January 5 at 5:30 p.m. Eric gave Brianna Infants' Tylenol®, at 5:30 p.m. January 5. She continued to run a high fever and appeared lethargic, and he returned with

her to the OGH emergency department. Initially, OGH personnel informed Eric there was no reason to admit Brianna. However, Eric's father had accompanied Eric to OGH, and he insisted that she be admitted because of her condition.

On the morning of January 6, tests showed that Brianna had acetaminophen toxicity. Mucomyst, the antidote for acetaminophen overdose, was given to Brianna. After further testing showed that Brianna's liver had been damaged, she was transported by helicopter to Children's Hospital in New Orleans. In New Orleans, it was determined that Brianna needed a liver transplant to survive, and she was transported to a liver transplant hospital in Omaha, Nebraska. The viral illness for which Brianna was initially treated at OGH prevented a transplant from being performed, and she died of liver failure secondary to acetaminophen toxicity on January 8, 2003.

Eric and Christina filed two separate lawsuits: one against OGH and Dr. Guy Godeaux for medical malpractice, as provided in the Louisiana Medical Malpractice Act, La.R.S. 44:1299.41−49, for the erroneous Infants' Tylenol® dosing instruction given to them and one against McNeil-PPC, Inc. (McNeil), the manufacturer of Infants' Tylenol® for products liability, pursuant to the Louisiana Products Liability Act (LPLA), La.R.S.9:2800.51−60. The lawsuits were consolidated for trial. On March 1, 2010, OGH admitted liability and paid the Huttos $100,000.00, pursuant to La.R. 40:1299.42. Dr. Godeaux was then dismissed voluntarily on March 5, 2010. Due to OGH's admission of liability, the Patients Compensation Fund (PCF) entered the case to defend the fund on the issue of causation and damages. *See* La.R.S. 40:1299.44. The case proceeded to trial against McNeil and the PCF.

The case was tried before a jury over six days from June 15 to 26, 2010. After deliberating, the jury returned a verdict in which it indicated that neither the label on Infants' Tylenol® nor the design of Infants' Tylenol® was defective; however, it assessed 23% fault to McNeil. Finding the verdict internally inconsistent, the trial court instructed the jury to continue deliberating to resolve the inconsistency.

The jury did as instructed and, thereafter, returned a verdict finding the labeling on Infants' Tylenol® was defective; it assessed 23% fault to McNeil, 70% fault to OGH, 2% fault to Christina, and 5% to Theresa. In its verdict, the jury awarded Christina and Eric each damages in the amounts of $1 million for mental pain and suffering and $1 million for their loss of Brianna's love and affection and awarded survival damages for Brianna's mental pain and suffering in the amount of $500,000.00 and for her physical pain and suffering in the amount of $500,000.00. On July 15, 2010, the trial court entered judgment based on the jury's second verdict against McNeil for $1,157,774.40, exclusive of interest, and against the PCF for $421,912.19, exclusive of interest.

All the parties filed motions for judgment notwithstanding the verdict (JNOV), which the trial court denied after a hearing. McNeil appealed, and the Huttos and OGH answered the appeal.

### ASSIGNMENTS OF ERROR

Each party assigns errors with the jury's verdict as follows:

**McNeil:**

> 1. Does nondisclosure of a secret agreement between the Huttos and one defendant, whereby that defendant becomes interested in Plaintiffs' recovery of a large verdict, thereby secretly realigning the parties without the knowledge of the jury, the court or a co-defendant, so taint the trial with unfairness and prejudice to the other defendant that a new trial is mandated?

4

2. Does federal law preempt the Huttos' claims that McNeil should provide dosing or other warning instructions for children under two years of age on the Infants' Tylenol® label, where it is uncontroverted that the [Food and Drug Administration (FDA)] rejected McNeil's repeated proposals to include such dosing information, and that the FDA would not permit the general label additions sought by Plaintiffs?

3. Did the Huttos sustain their burden against McNeil on the LPLA failure to warn labeling claim, where they had previously used Infants' Tylenol® safely, but then subsequently relied only upon admittedly negligent dosing instructions from hospital medical personnel and used a teaspoon to give massive overdoses to their daughter in contravention of the label's explicit instruction to use only the enclosed dropper?

4. Was the 3 a.m. verdict reached by the jury affected by error and confusion, and so irreconcilable and inconsistent with its first verdict, that a new trial should have been granted?

5. Are the jury's awards of $4 million ($2 million to each parent) in wrongful death damages, and $1 million in survival damages, an abuse of discretion and excessive?

**Christina and Eric Hutto:**

1. Was the jury's assessment of fault to OGH manifestly erroneous in light of an alternative design for Infant's Tylenol®?

2. Was it was error for the jury to assess 2% fault to Christina and 5% fault to Theresa?

3. Was it error for the jury to determine McNeil was 23% fault and OGH was 70% at fault?

**OGH:**

1. Should a judgment notwithstanding the verdict have been granted assessing liability only to McNeil because it was the primary initiator of the chain of events leading to Brianna's death as its Infant's Tylenol® label caused product and dosing confusion?

## DISCUSSION

McNeil manufactures Infants' Tylenol® for use in children under 3 years of age; it is administered via an enclosed dropper and has a concentration of acetaminophen of 160 mg per 1.6 ml. By contrast, Children's Tylenol® is labeled

for use in children between the ages of two and eleven years of age, is administered in teaspoons, and has a concentration of 160 mg per 5 ml (which is equal to 1 teaspoon). McNeil manufactured Infants' Tylenol® because it is more concentrated than Children's Tylenol® and, therefore, easier to give to infants and young children who may be unable or unwilling to swallow medication in larger amounts. The Infants' Tylenol® dropper has markings for 0.4 ml and 0.8 ml. The label cautions users: "Use only enclosed dropper to dose this product. Do not use any other dosing device." The label also warns: "Do not exceed the recommended dose." Infants' Tylenol® can be given every four hours, not to exceed five doses in twenty-four hours.

In January 2003, Infants' Tylenol® did not provide dosing information for children less than two years of age. Instead, its instructions directed "call a doctor" for children under two years of age experiencing fever or pain. According to McNeil, this was because the FDA determined that medical intervention may be necessary for children less than two years of age suffering from fever and that parents should not medicate those children without a doctor's involvement.

The two products caused confusion for caregivers, and McNeil developed a dosing sheet that included information not contained on Infants' Tylenol® label or packaging. The dosing sheet was to be provided to caregivers by health care providers to clarify the different dosing instructions for the four products included thereon. It distinguished between Infants' Tylenol® and Children's Tylenol®, explained that Infants' Tylenol® is more concentrated than Children's Tylenol®, and provided separate dosing charts for the two formulations. McNeil asserts no

6

patient receiving this dosing sheet has ever suffered an overdose causing liver injury.

## STANDARD OF REVIEW

All parties urge the trial court erred in denying their motions for JNOV because the trial court committed legal error or the jury committed manifest error. "When a trial court denies a motion for JNOV, the appellate court reviews the record to determine whether the jury committed manifest error or whether there was an error of law." *Simmons v. Transit Mgmt. of Se. La., Inc*., 01-1648, p. 8 (La.App. 4 Cir. 5/8/02), 819 So.2d 1083, 1088, *writs denied*, 02-2097, 02-2112 (La. 11/1/02), 828 So.2d 582, 581-82, respectively.

### Did Christina and Eric & OGH enter into a Mary Carter Agreement?

In its first assignment of error, McNeil contends it is entitled to a new trial because an agreement the Huttos and OGH entered into the evening before trial began was a Mary Carter agreement which was prejudicial to it. In *Thibodeaux v. Ferrellgas Inc*., 97-1267, pp. 5-6 (La.App. 3 Cir. 7/29/98), 717 So.2d 668, 672, *writs denied,* 98-2321, 98-2325 (La. 11/13/98), 731 So.2d 266, this court considered whether a settlement agreement between the plaintiffs and some of the defendants was a Mary Carter agreement and explained:

> The term "Mary Carter" agreement refers to a contract between a plaintiff and one co-defendant typically with the following features: (1) secrecy; (2) the contracting defendant remains a party to the suit; (3) the contracting defendant's liability will be reduced proportionately by increasing the liability of its co-defendants; and (4) the contracting defendant guarantees the minimum recovery to the plaintiff.

In *Thibodeaux*, co-defendants found to be at fault for the explosion of a camp urged that the trial had been tainted by a Mary Carter settlement agreement between the plaintiffs and a number of defendants associated with the gas company

which provided gas to the camp. As part of the settlement, the plaintiffs agreed to hold the settling defendants harmless and to assist them in prosecuting their claims against the remaining defendants. Additionally, the plaintiffs agreed to retain the services of the settling defendants' attorneys, and the settling defendants agreed to retain the services of the plaintiffs' attorneys. This court held that the agreement was against public policy and voided the jury's verdict. The "realignment" of the plaintiffs and the settling defendants against the remaining co-defendants during the trial was important to the court's determination that the agreement was a Mary Carter agreement.

The agreement between the Huttos and OGH provided, in part, that counsel for the Huttos, the PCF, and OGH agreed "to jointly cooperate in the trial . . . to minimize the percentage of fault allocated to the PCF . . . [to] less than 10%, if any at all" and the PCF would support the Huttos' damages arguments. The agreement further set forth separate contentions depending on whether the case settled before trial or was tried. If the case was tried and the Huttos obtained a total judgment of $3 million or more, they agreed to reduce their judgment against the PCF by $250,000.00, but the reduction would not result in a credit owed by them to the PCF. In the event the judgment was less than $3 million, the jury's verdict established their responsibilities to each other.

After reviewing the evolution of comparative negligence in Louisiana, this court's opinion in *Thibodeaux*, and the position of the parties in this litigation, the trial court determined the agreement between OGH and the Huttos was not a Mary Carter agreement, explaining:

> There is no doubt that the Patient's Compensation Fund could benefit if the jury award went to a certain level. There also is no doubt that the McNeil-P.P.C. and Patient's Compensation Fund, nominal defendant-intervenor, were not co-obligors. They were not co-

8

defendants in the sense that was contemplated, I believe, by the *Thibodeaux v. Ferrellgas* [case]. As a result, while that agreement has a certain question to it, I do not believe it rises to the level prohibited by the *Thibodeaux* case[,] and I find that it's not a Mary Carter agreement.

The PCF's status as a nominal defendant and its potential liability were large factors in the trial court's determination. Before and throughout the trial, the trial court and McNeil recognized that as a nominal defendant, the PCF's position was not the same as McNeil's because the PCF entered the litigation with its liability already established.

*Thibodeaux* explained that Mary Carter agreements violate public policy when they are unknown to the trier of fact because they distort the litigation process. The settlement in *Thibodeaux* was "a true compromise" where the plaintiffs received a sum of money in exchange for dismissing their claims against the settling defendants and holding them harmless.

The agreement between the Huttos and the PCF/OGH was secret. However, it was not a true compromise because the Huttos did not receive any money; they did not settle their claims against the PCF; and the PCF remained potentially liable to them, albeit for a significantly reduced amount. Additionally, as noted by the trial court, the PCF had no defense to liability and, therefore, was not McNeil's co-defendant as contemplated by *Thibodeaux*. Moreover, as argued by the PCF, the jury's assessment of 70% fault to it shows McNeil was not prejudiced by the agreement.

For these reasons, we find the trial court did not err in finding that the agreement was not a Mary Carter agreement and that a new trial was not warranted.

9

*Are Christina and Eric's claims against McNeil preempted by FDA regulations?*

McNeil contends the Huttos' claims were preempted by the Food, Drug and Cosmetic Act (FDCA), 21 U.S.C. §§ 301-399(D), and its implementing regulations, asserting the FDA has the final say with regard to warnings it can include on Infants' Tylenol®. McNeil claims it could not modify or change the warnings on Infants' Tylenol® without FDA approval and that all attempts to make such modifications or changes had been rejected by the FDA.

The Huttos contend there were warnings that would have kept them from administering the excessive one-teaspoon doses to Brianna that McNeil never sought to put on Infants' Tylenol®. These warnings include: (1) Infants' Tylenol® can cause liver damage; (2) overdose of Infants' Tylenol® can cause death; (3) a maximum single dose warning; (4) Infants' Tylenol® is several times stronger than Children's Tylenol®; and (5) the symptoms of overdose of Infants' Tylenol®.

The Supreme Court addressed the issue of preemption in *Wyeth v. Levine,* 555 U.S. 555, 571, 129 S.Ct. 1187, 1198 (2009), where it held that state failure-to-warn claims against a drug manufacturer are not preempted by the FDCA unless the manufacturer establishes by "clear evidence that the FDA would not have approved a change to [the drug's] label." If the manufacturer fails to present such evidence, the Supreme Court "will not conclude that it was impossible for the [manufacturer] to comply with both federal and state requirements." *Id.*

The Court rejected Wyeth's argument that it could not unilaterally add a warning without violating federal law governing misbranding and unauthorized distribution of unapproved drugs pursuant to the "changes-being-effected" (CBE) regulation, 21 U.S.C. §§ 314.70(c)(6)(iii)(A), (C), which allows a manufacturer to

make changes to a label before receiving FDA approval. In doing so, it noted that allowable changes include adding or strengthening a "contraindication, warning, precaution, or adverse reaction" or "an instruction about dosage and administration that is intended to increase the safe use of the drug." *Id.* 555 U.S. at 568, 129 S.Ct. at 1196 (quoting 21 U.S.C. §§ 314.70(c)(6)(iii)(A), (C)). Specifically, the Supreme Court held that the CBE regulation permits a brand-name drug manufacturer like Wyeth "to unilaterally strengthen its warning" without prior FDA approval. *Id.* 555 U.S. at 573, 129 S.Ct. at 1199. The Court concluded that Wyeth was allowed to strengthen its label in compliance with its state tort duty prior to obtaining approval from the FDA.

McNeil cites *PLIVA, Inc. v. Mensing*, __ U.S. __, 131 S.Ct. 2567 (2011), as support for its position. *PLIVA* dealt with state law claims against manufacturers of generic drugs, not a brand-name manufacturer like McNeil. It held that manufacturers of generic drugs can only include warnings on their labels that have been approved for the generic drugs' brand-name drug counterparts. The Court determined that federal drug regulations applicable to generic drug manufacturers directly conflict with, and thus preempted, the plaintiff's state law claims of failure to provide an adequate warning label. The Court specifically noted that its holding was not contrary to *Wyeth*.

McNeil admitted it did not attempt to have all the warnings the Huttos argue would have prevented Brianna from being overdosed included on its Infants' Tylenol® label. Therefore, it did not establish that it was impossible to comply with both federal and state law and failed to show that the Huttos' claims are preempted by federal law.

11

***Did Christina and Eric carry their burden of proof under the LPLA?***

McNeil next asserts that the Huttos did not carry their burden of proof on their LPLA failure to warn labeling claim because they had previously used Infants' Tylenol® safely but subsequently relied only upon the negligent dosing instruction from OGH's personnel and used a teaspoon to measure the doses they administered to Brianna in contravention of the label's explicit instruction to only use the enclosed dropper.

In *Jack v. Alberto-Culver USA, Inc*, 06-1883, p. 4 (La. 2/22/07), 949 So.2d 1256, 1258, the supreme court outlined a plaintiff's burden of proof in a products liability case, stating:

> To maintain a successful products liability action under the LPLA, a plaintiff must establish four elements: (1) that the defendant is a manufacturer of the product; (2) that the claimant's damage was proximately caused by a characteristic of the product; (3) that this characteristic made the product "unreasonably dangerous;" and (4) that the claimant's damage arose from a reasonably anticipated use of the product by the claimant or someone else. La. R.S. 9:2800.54(A).

"A product is 'unreasonably dangerous' under the LPLA if and only if the product meets at least one of [four] criteria," one of which is that "the product is unreasonably dangerous because an adequate warning about the product has not been provided as provided in La. R.S. 9:2800.57." *Id.*

> In a failure to warn case, the claimant bears the burden of establishing that "at the time the product left the manufacturer's control, the product possessed a characteristic that may cause damage and the manufacturer failed to use reasonable care to provide an adequate warning of such characteristic and its danger to users and handlers of the product." La. R.S. 9:2800.57. The LPLA defines "adequate warning" as:
>
> > a warning or instruction that would lead an ordinary reasonable user or handler of a product to contemplate the danger in using or handling the product and either to decline to use or handle the product or, if

possible, to use or handle the product in such a manner as
to avoid the danger for which the claim is made.

La.R.S. 9:2800.53(9).

*Id.* at 1258-59. Whether a product is unreasonably dangerous due to an inadequate warning is a question for the trier of fact which is reviewed under the clearly wrong/manifest error standard. *Brooks v. State ex rel. Dep't of Transp. and Dev.*, 10-1908 (La. 7/1/11), __ So. 3d __.

The Huttos presented expert testimony that the Infants' Tylenol® labeling was defective because: it failed to provide a maximum single dose warning; it failed to warn that it could cause liver injury; it failed to advise that it was several times stronger than Children's Tylenol®; and it failed to identify the symptoms of an overdose. The Huttos testified that they would have known one teaspoon of Infants' Tylenol® was excessive for Brianna and that they would not have purchased the product if these warnings had been on Infants' Tylenol®. This evidence provided a reasonable basis for the jury's finding that Infants' Tylenol® was unreasonably dangerous due to its label, and it is not clearly wrong. *Id.*

McNeil contends, however, that the Huttos' administration of one-teaspoon doses was not a reasonably anticipated use of Infants' Tylenol® as required by La.R.S. 9:2800.54(A); therefore, they did not carry their burden of proof. This section provides:

The manufacturer of a product shall be liable to a claimant for damage proximately caused by a characteristic of the product that renders the product unreasonably dangerous when such damage arose from a reasonably anticipated use of the product by the claimant or another person or entity.

A "reasonably anticipated use" of a product is defined as "a use or handling of a product that the product's manufacturer should reasonably expect of an ordinary person in the same or similar circumstances." La.R.S. 9:2800.53(7).

13

Whether a use should be reasonably anticipated is "ascertained from the point of view of the manufacturer at the time of manufacture." *Payne v. Gardner*, 10-2627, p. 3 (La. 2/18/11), 56 So.3d 229, 231. The term "effectively conveys the important message that 'the manufacturer is not responsible for accounting for every conceivable foreseeable use' of its product." *Id.*

McNeil's argument is premised in part on the Huttos' use of a teaspoon to measure the Infants' Tylenol® and the enclosed dropper to administer the Infants' Tylenol® to Brianna, rather than using the dropper to measure and administer the doses, and on their removal of a safety valve in Infants' Tylenol to facilitate pouring one teaspoon of the product from the bottle.

The Infants' Tylenol® label instructs: "Use only enclosed dropper to dose this product. Do not use any other dosing device." "Dose" is a noun or a verb depending on how it is used in a sentence. MERRIAM-WEBSTER ONLINE DICTIONARY, http://www.merriam-webster.com/dictionary/dose (last visited November 28, 2011). Pertinent to this case, dose means "to give a dose to" when used as a verb; it means "the measured quantity of a therapeutic agent to be taken at one time," when used as a noun. *Id.* Accordingly, McNeil should have "reasonably expected" that "dose" could be interpreted as it was by the Huttos, i.e., that a measuring implement other than the dropper would be used to measure Infants' Tylenol® and that the dropper would be used to administer it.

McNeil also argues Christina and Theresa knew or should have known that one teaspoon was an improper dose for Brianna because their prior use of Infants' Tylenol® in the small amounts of one-half dropper and one dropper should have alerted them that one teaspoon or approximately six droppers was excessive. It further argues that the label's statement that two droppers is the maximum dose to

14

be given to children two to three years of age should have alerted them that one teaspoon was excessive.

Infants' Tylenol® directed caregivers of infants under two years of age to "call a doctor" for dose instructions. Christina consulted OGH and followed its instruction but only after Theresa "verified" the correct dose for Brianna's weight. McNeil's argument would require Christina and Theresa to deduce from a number of factors that OGH's instruction was wrong although they verified its correctness. Under these facts, we cannot say the jury's determination otherwise is clearly wrong.

Lastly, McNeil points to testimony which indicates Brianna's overdose resulted from Brianna having been given doses much greater than those testified to by the Huttos. Dr. Barry Rumack, a pediatrician and medical toxicologist who developed the antidote for acetaminophen toxicity, testified that Brianna's condition was not consistent with the doses reportedly administered by the Huttos. He calculated that Brianna had been given a minimum of one and one-half bottles and as much as two and one-half bottles of Infants' Tylenol® between midnight January 3 and noon January 4.

Christopher Morrow, a pharmacist, testified in a pre-trial deposition that Theresa had contacted him Saturday, January 4, regarding the appropriate dose of Infants' Tylenol® for an infant five months of age, and stated Brianna had been given two to three bottles of Infants' Tylenol®. Mr. Morrow explained, however, at trial that upon reflection after his deposition, he determined his memory was incorrect and that Theresa had called him Monday, January 5, not Saturday, January 4. In doing so, Mr. Morrow noted that his deposition was not taken until six years after the call occurred and that after his deposition, he reviewed the

timeline of the events and concluded his deposition testimony was incorrect. Mr. Morrow indicated, however, on the correction sheet for his deposition, "I need to change the timeline. Theresa first called me on Saturday at about 12:00 noon." Theresa testified that she did not contact Mr. Morrow until Monday, January 6, after Brianna was hospitalized.

Dr. Mia Ben, the pediatrician who treated Brianna Monday, January 6 at OGH, testified that based on Brianna's liver toxicity, she had to have been given more than four teaspoons of Infants' Tylenol®. Dr. Ben also testified that Christina and Theresa related to her that they had given Brianna four bottles of Infants' Tylenol®, which equates to twelve teaspoons. This amount was three times the four teaspoons Christina and Theresa testified they had given Brianna between leaving OGH Friday, January 3 through the evening of January 5. Moreover, twelve teaspoons in two days, January 4 and 5, exceeded the Infants' Tylenol® instruction not to exceed five doses per day.

"When there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong." *Rosell v. ESCO*, 549 So.2d 840, 844 (La.1989). Moreover, on review, "[a]n appellate court . . . must be cautious not to re-weigh the evidence or to substitute its own factual findings just because it would have decided the case differently." *Id.* at 844.

The jury was presented with two permissible views regarding the Huttos' administration of Infants' Tylenol® to Brianna and accepted the Huttos' version. While Dr. Rumack's testimony and Mr. Morrow's recanted testimony contradicted the Huttos' testimony, it would require the jury to believe that Christina and Theresa administered one teaspoon of Infants' Tylenol® to Brianna approximately every two and one-half hours at a minimum and possibly every one and one-half

16

hours. Additionally, Dr. Ben admitted that errors in documenting patient information can occur when it is obtained during an emergency. Accordingly, the jury's acceptance of the Huttos' testimony regarding the doses of Infants Tylenol® they administered to Brianna is not manifestly erroneous or clearly wrong.

McNeil next asserts that "the only use of Infants' Tylenol® it reasonably anticipated was use under proper instructions from a physician" and that it could not reasonably anticipate that a physician would fail to use the dosing sheet. The tragedy in this case would not have occurred except for McNeil's manufacture of both Infants' Tylenol® and Children's Tylenol® and the confusion that existed between the two. Although McNeil sought to distinguish the two products and to clear the confusion between them and the proper dosing amounts for each with the dosing sheets by relying upon health care providers to distribute them, expert testimony showed the dosing sheets did not eliminate all confusion between the two products. This testimony and the similarities between Infants' Tylenol® and Children's Tylenol® provided a reasonable basis for the jury to conclude that McNeil should have reasonably anticipated that misunderstandings between caregivers and health care providers such as the one here could still occur. Furthermore, the jury could have concluded that McNeil should have reasonably anticipated that a health care provider could be negligent in distributing its dosing sheets in light of its negligence in creating the confusion between the two products.

McNeil further argues that OGH's negligence in failing to instruct Christina that its dosing instruction was for Children's Tylenol® and not Infants' Tylenol® was the proximate cause of Brianna's death, not the Infants' Tylenol® label.

A cause is a legal cause in fact if it has a proximate relation to the harm which occurs. *Butler v. Baber*, 529 So.2d 374 (La.1988). "A proximate cause is

generally defined as any cause which, in natural and continuous sequence, unbroken by any efficient, intervening cause, produces the result complained of and without which the result would not have occurred." *Sutton v. Duplessis*, 584 So.2d 362, 365 (La.App. 4 Cir. 1991). If there is more than one cause of injury, "a defendant's conduct is a cause-in-fact if it is a substantial factor generating plaintiff's harm." *Rando v. Anco Insulations, Inc.*, 08-1163, 08-1169, p. 31 (La. 5/22/09), 16 So.3d 1065, 1088. Causation is an issue of fact subject to the manifest error standard of review. *Id.*

The Huttos testified that they would not have purchased Infants' Tylenol® if it warned it could cause liver damage or death and that a maximum single dose warning would have caused them to "second guess" OGH's instruction. Accordingly, the jury's determination that the Huttos proved the Infants' Tylenol® was a proximate cause of their harm was not manifestly erroneous.

***Did the Trial Court Commit Reversible Error by Instructing the Jury to Reconcile Inconsistencies in its Original Verdict?***

After deliberating approximately four hours, the jury informed the trial court it had reached a verdict. Upon review of the verdict form, the trial court determined that the jury's verdict was inconsistent, as the jury had answered "No" to the two interrogatories questioning whether Infant's Tylenol®'s warnings were insufficient or whether the product was defectively designed but assessed 23% fault to McNeil. The trial court instructed the jury to continue deliberating to resolve the inconsistencies. The jury did as instructed and returned with a verdict finding Infant's Tylenol® warnings were insufficient and retaining the 23% assessment of fault to McNeil.

McNeil filed a motion for JNOV, asserting the trial court erred in instructing the jury to resolve the inconsistencies in its verdict rather than reducing the

inconsistent verdict to writing and signing it. It asserts the trial court's denial of its motion for JNOV constitutes error.

Louisiana Code of Civil Procedure Article 1813 provides, in pertinent part:

> A. The court may submit to the jury, together with appropriate forms for a general verdict, written interrogatories upon one or more issues of fact the decision of which is necessary to a verdict. . . .
>
> . . . .
>
> D. When the answers are consistent with each other but one or more is inconsistent with the general verdict, the court may direct the entry of judgment in accordance with the answers, notwithstanding the general verdict, or may return the jury for further consideration of its answers and verdict, or may order a new trial.
>
> E. When the answers are inconsistent with each other and one or more is likewise inconsistent with the general verdict, the court shall not direct the entry of judgment but may return the jury for further consideration of its answers or may order a new trial.

The trial court chose to follow the second provision of Section D and instructed the jury to continue its deliberations and further consider its answers. It did not err in doing so.

### *Are the Jury's Fault Assessments Manifestly Erroneous?*

Christina and Eric argue the jury's assessments of fault were clearly wrong, and OGH argues the jury's assessment of 70% fault to OGH was clearly wrong.

The jury's apportionment of fault is a factual determination which can only be disturbed if it is clearly wrong or manifestly erroneous. *Clement v. Frey*, 95-1119, 1163 (La. 1/16/96), 666 So.2d 607. The assessment of fault is guided by the factors set forth in *Watson v. State Farm Fire & Casualty Insurance Co.*, 469 So.2d 967 (La.1985). In *Watson*, the supreme court determined various factors influence the percentage of fault assigned to the parties. Those factors include: (1) whether the conduct resulted from inadvertence or involved an awareness of the danger; (2) how great a risk was created by the conduct; (3) the significance of

19

what was sought by the conduct; (4) the capacities of the actor, whether superior or inferior; and (5) any extenuating circumstances which might require the actor to proceed in haste without proper thought. *Id.*

We begin with the jury's assessment of fault to Christina and Theresa. The testimonies of Dr. Rumack, Mr. Morrow, and Dr. Ben, outlined previously, provided a reasonable basis for the jury's assessment of fault to Christina and Theresa. Additionally, Christina testified that Brianna had not had anything to drink over the weekend which could have led the jury to determine Brianna should have been returned to OGH sooner than she was. For these reasons, the jury's assessments of fault to Christina and Theresa are not clearly wrong.

The Huttos next urge the jury erred in not assessing more fault to McNeil because Infants' Tylenol® was unreasonably dangerous in design as provided in La.R.S. 9:2800.56 in that it also manufactured and marketed the less potent Children's Tylenol® which could be used exclusively or it could have marketed Infants' Tylenol® by prescription only.

Louisiana Revised Statutes 9:2800.56 provides:

A product is unreasonably dangerous in design if, at the time the product left its manufacturer's control:

(1) There existed an alternative design for the product that was capable of preventing the claimant's damage; and

(2) The likelihood that the product's design would cause the claimant's damage and the gravity of that damage outweighed the burden on the manufacturer of adopting such alternative design and the adverse effect, if any, of such alternative design on the utility of the product. An adequate warning about a product shall be considered in evaluating the likelihood of damage when the manufacturer has used reasonable care to provide the adequate warning to users and handlers of the product.

20

Although an alternative product exists which can prevent the damage at issue, the plaintiff must also satisfy the risk/utility analysis to determine whether the utility of the product is outweighed by its risk of harm. La.R.S. 9:2800.56; *Gruver v. Kroger Co.*, 10-689 (La.App. 3 Cir. 2/2/11), 54 So.3d 1249, *writ denied*, 11-471 (La. 4/25/11), 62 So.3d 92.

The Huttos relied on expert testimony that Children's Tylenol® provided the same medication without the confusion created by the concentrated Infants' Tylenol®. McNeil argues the Huttos did not satisfy their burden of proof with this testimony because it did not address the risk/utility assessment required for alternative design claims. McNeil points out that experts testified concentrated Infants' Tylenol® was beneficial because it was easier to administer to small infants who cannot swallow easily, as it is given in much smaller volume than Children's Tylenol®. In light of the competing expert testimony on this issue, the jury's conclusion that Infant's Tylenol® was not unreasonably dangerous because an alternative design for it existed was not clearly wrong.

The Huttos and OGH urge the jury's assessment of 70% fault to OGH was clearly wrong because: (1) McNeil was solely responsible for failing to provide adequate and proper warnings to minimize or eliminate confusion; (2) there is no evidence OGH or any other health care provider agreed to accept responsibility under the LPLA; and (3) McNeil, as the manufacturer of Infants' Tylenol®, was the "primary initiator" of the events leading to Brianna's death. In response, McNeil contends OGH's failure to use the dosing sheet was a superceding intervening cause which shields it from liability.

In *Johnson v. Morehouse General Hospital*, 10-387, 10-488, pp. 43-44 (La. 5/10/11), 63 So.3d 87, 116 (citations omitted), the supreme court recently addressed the concept of superceding or intervening cause, explaining:

> A superceding or intervening cause is one which comes into play after the defendant's negligent conduct has ceased, but before the plaintiff suffers injury. In situations in which there is an intervening force that comes into play to produce the plaintiff's injury (or more than one cause of an accident), it has generally been held that the initial tortfeasor will not be relieved of the consequences of his or her negligence unless the intervening cause superceded the original negligence and alone produced the injury. If the original tortfeasor could or should have reasonably foreseen that the accident might occur, he or she will be liable notwithstanding the intervening cause. In sum, foreseeable intervening forces are within the scope of the original risk, and hence of the original tortfeasor's negligence.

The supreme court further explained that "a superceding cause is technically the last act of negligence and is usually determined to be the sole cause of the injury." *Id.* at 117.

OGH's negligence was the last act of negligence; however, it was not the sole cause of Brianna's overdose. The risk created by McNeil's conduct was the very risk that materialized in this case: confusion between Infants' Tylenol® and Children's Tylenol® would cause injury to an infant. Rather than putting a maximum single dose warning on Infants' Tylenol® or removing it from the market, McNeil sought to clarify the confusion between the two products with its dosing sheet. It relied on health care providers to distribute the dosing sheet and eliminate the confusion the two products created. We find it was reasonably foreseeable that circumstances would arise where a health care provider would fail to give a caregiver a dosing sheet. Moreover, OGH's negligence would not have occurred if McNeil had not been negligent in producing two similar products and providing inadequate warnings on Infants' Tylenol®. *Domingue v. State ex rel*

22

*Dep't of Pub. Safety*, 490 So.2d 772 (La.App. 3 Cir. 1986). Accordingly, OGH's negligence was not the sole cause of Brianna's overdose and resulting death.

We have considered the Huttos' and OGH's arguments regarding the jury's assessment of fault to OGH and McNeil in light of the evidence and find the jury's assessments of 70% fault to OGH and 23% fault to McNeil were not clearly wrong. While McNeil created the confusion which arose between Infants' Tylenol® and Children's Tylenol®, OGH recognized that the differences in the two products could be confusing to infant caregivers and developed a protocol to clear any confusion. Its personnel, however, did not follow that protocol when treating Brianna. Moreover, Christina informed OGH personnel that Brianna had been given Infants' Tylenol®, but OGH's nurse was negligent in failing to consider the information contained on the Intake Sheet when initially instructing Christina to give Brianna three-quarters of a teaspoon *and* when questioned as to the correctness of that instruction.

Both OGH and McNeil were aware of the danger presented by Infants' Tylenol® when Brianna was treated at OGH, but OGH was in a position superior to that of McNeil. It had knowledge of the important differences between Infants' Tylenol® and Children's Tylenol®, *and* it had the opportunity to correct its incorrect dosage instruction but failed to do so. Therefore, the jury's assessment of 70% fault to OGH was not clearly wrong.

### Do the Jury's Damage Awards Constitute an Abuse of Discretion?

McNeil contends the jury's damage awards for wrongful death and survival damages constitute an abuse of discretion by the jury and should be reversed.

General damages may not be fixed with "pecuniary exactitude." *Guillory v. Lee*, 09-75, p. 14 (La. 6/26/09), 16 So.3d 1104, 1117. When reviewing general

damage awards an appellate court reviews the exercise of discretion by the trier of fact; it does not decide what it considers to be an appropriate award. *Id.* Only when the record clearly reveals that the trier of fact abused its much discretion in making its award can a damage award be disturbed. *Id.*

In reviewing damages, it is important to realize that reasonable persons frequently disagree about what is an appropriate award of damages in a particular case, but "[i]t is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award." *Youn v. Maritime Overseas Corp.,* 623 So.2d 1257, 1261 (La.1993), *cert. denied*, 510 U.S. 1114, 114 S.Ct. 1059 (1994).

> The elements of damage for a wrongful death action are loss of love, affection, companionship, services, support, medical expenses and funeral expenses. . . . Additionally, the courts have allowed damages in wrongful death actions for mental pain, suffering, and distress resulting from the death of the victim.
>
> . . . .
>
> The determination of the severity of mental anguish or distress resulting from the death of another is a fact question which depends upon several components, including, but not limited to, the closeness of the ties between the parties, the degree of love in the relationship, and the length of the relationship.

*Hill v. Shelter Mut. Ins. Co.*, 05-1783, 05-1818, pp. 5-6 (La. 7/10/06), 935 So.2d 691, 695 (citations omitted).

Christina and Eric's testimony and that of their parents descriptively reveal the severe and devastating impact Brianna's overdose and resulting death had on them. After learning Brianna had acetaminophen toxicity, Christina testified her "whole body went numb" because she was the one who was supposed to take care

24

of and protect Brianna—but she had not done so. Instead, she had relied on someone else to tell her how to take care of Brianna.

On Monday, January 6, Brianna was transported by helicopter to Children's Hospital in New Orleans. She was accompanied by a doctor, but Christina and Eric could not travel with her and drove to New Orleans separately. Upon arriving at Children's Hospital, Christina and Eric were informed that Brianna's case was one of the worst cases of acetaminophen toxicity the hospital had seen. Christina explained that she felt like she had died inside and that she had failed to protect Brianna. Christina testified that when she saw Brianna:

> It was horrible. She was flat. . . . There were machines beeping all over the place. There was [sic] wires everywhere. We couldn't get that close to her because of all of the machines. . . . Brianna woke up for a moment . . . She started coming to, hearing my voice talking to the nurse, asking her what all the wires were for and the machines and when she heard my voice, she raised her arms to me to pick her up and began to cry. It wasn't—it wasn't like a normal spoiled cry because she was always being held. It was like a fear, like an empty cry. And I wasn't allowed to pick her up. I tried to lean down and comfort her and to sing her nursery song—her nursery song that I would always sing to her to calm her down. It wasn't working. She hadn't had anything to drink at all during the weekend that she was able to hold down so she started foaming from the mouth. I couldn't take it anymore. I ran out of the room.

Efforts at Children's Hospital to treat Brianna were unsuccessful, and only a liver transplant could save her. Brianna had to be transported to a hospital in Omaha, Nebraska that specializes in transplants. While being transported by ambulance to the jet that flew them to Omaha, Brianna "died" but was revived. Christina described the ambulance ride: "She wasn't moving. She wasn't fussing. She wasn't doing anything but just laying [sic] there and accepting the breathing machine. Eric and I cried the whole time. I still had faith, but it was dwindling fast."

25

Eric and Christina were both willing to be donors for Brianna. In order for Brianna to receive a transplant, however, she had to breathe on her own; she never did. The morning after arriving in Omaha, Christina and Eric learned Brianna had died when they went to meet her and tell her good morning. An autopsy had to be performed on Brianna. Christina explained, "It wasn't fair. She shouldn't have to go through something like that." The trip back to Opelousas was worsened by the fact that Brianna was transported in the luggage compartment of the airplane.

Christina and Eric remained with Brianna after returning to Opelousas as much as they could; they slept next to her coffin at the funeral home. In Christina's mind, Brianna was not dead, "She was peaceful. She was sleeping . . . it still wasn't true. . . . [I]t didn't happen. She wasn't gone. I could see her, she was right there, just sleeping." Reality set in when Brianna's casket was closed. Christina "flipped out" after she realized she would never see Brianna again. She testified that she "ran," leaving her husband, her family, and her home. She hated God, trusted no one, and considered herself a disgrace. She continues to have nightmares, testifying that nothing, including therapy and medication, has helped.

Eric's testimony concerning the events leading to Brianna's death and his life after her death mirrors Christina's. He testified that while in Children's Hospital, Brianna's "tongue looked like it was cracked and her lips was [sic] peeling and cracking because she hadn't had no [sic] water or nothing to drink. . . . [I]t was horrible." Eric had trouble describing his feelings, relating, "I don't know how to even explain it. It just . . . hurt to see your daughter laying there in pain like that and not knowing if she's going to make it or not, seeing her like that knowing that there's nothing you can do about it." After Brianna died, Eric "felt dead. . . . empty inside, like my world ended. . . . It's just the worst feeling

26

imaginable. You can't explain it . . . my heart stopped. Everything stood still. I thought I was going to die." He explained to the jury: "It's something that you don't want to remember. It's something that hurts so bad that you just want it to go away."

Eric did not truly comprehend that Brianna was dead until she was buried. He related, "That's when it hit me, really hit me. That's when it dawned on me that she wasn't coming back, she was gone." Eric testified that losing Brianna was much worse than losing his mother, although he loved them the same and would never see either of them again, because he would "never be able to watch her grow up, never be able to pick her up from school, never to be able to . . . do things on the weekend with her, take her to the zoo, go on vacation, nothing."

Eric testified that he is not the same as he was before Brianna's death. He is no longer happy and does not enjoy talking or visiting as he did. He is depressed 99% of the time and often wants to be alone. He takes Xanax and sleeps a lot. He has anxiety attacks which have caused him to pass out in public and required him to be hospitalized. He has crying episodes. Eric related that he lost his faith in God and has not gone to church since Brianna's death. He also explained that he was very upset that Brianna was buried without her organs due to the autopsy because it is against his Catholic religion. Eric further testified that he continues to talk to Brianna at night, often visits her gravesite, and regularly cleans it.

Christina and Eric unwittingly administered the Infants' Tylenol® that caused the acetaminophen toxicity which ultimately led to Brianna's death when "they were supposed to protect her." Knowing that they followed OGH's instructions and that nothing on the Infants' Tylenol® bottle or packaging warned them otherwise is no solace for these two young people. Under these

circumstances, we cannot say the jury abused its discretion in awarding them each $2 million dollars for wrongful death damages.

We have considered McNeil's argument that this court held previously in *Tingle v. American Home Assurance Co.*, 10-71, 10-72 (La.App. 3 Cir. 6/2/10), 40 So.3d 1169, *writs denied*, 10-1562, 10-1563, 10-1564, 10-1578, 10-1580 (La. 10/29/10), 48 So.3d 1095-96, that $700,000.00 is the maximum acceptable award for the wrongful death of a child and find it is not dispositive of our review for two reasons.  First, the panel therein cited *Francis v. City of Rayne*, 07-359 (La.App. 3 Cir. 10/03/07), 966 So.2d 1105, *writ denied*, 07-2119 (La. 2/15/08), 976 So.2d 176, as the basis for its determination.  *Francis* was a claim for wrongful death of a parent, not a child.  Second, and more importantly, no case we have reviewed presents facts similar to the facts here.

McNeil also argues the jury's award of $1 million for survival damages is an abuse of the jury's vast discretion.

> Survival damages are damages awarded for the pre-death mental and physical pain and suffering of the deceased.  An award of survival damages is appropriate if there is even a scintilla of evidence of the fright, fear, or mental anguish during the ordeal leading to the death and of pain and suffering on the part of the decedent.

*Raymond v. Gov't Employees Ins. Co.*, 09-1327, p. 16 (La.App. 3 Cir. 6/2/10), 40 So.3d 1179,1192, *writ denied*, 10-1569 (La. 10/8/10), 46 So.3d 1268 (citations omitted).

Christina and Eric's testimony show that Brianna was in pain and suffered until near her death.  She was cognizant of them being present and wanted to be held and comforted by them, but they could not give her what she sought.  It is not for us to second guess the jury's determination of the pain, suffering, and mental anguish Brianna experienced during her last days, especially when her mother and

father could not hold her and give her the comfort and closeness she sought from them.

## CONCLUSION

Having found no legal error committed by the trial court and no manifest error committed by the jury, the trial court did not err in denying the motions for JNOV. Accordingly, the judgment is affirmed. All costs of this appeal are assessed to McNeil-PPC, Inc.

**AFFIRMED.**